564 F.2d 573
 10 ERC 1625, 184 U.S.App.D.C. 88, 7
Envtl. L. Rep. 20,702
 NATURAL RESOURCES DEFENSE COUNCIL, INC., Environmental
Defense Fund, Inc.
v.
Douglas M. COSTLE, Administrator, Environmental Protection
Agency, et al., National Forest Products
Association, Appellant.*
No. 75-1873.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 27, 1976.
Decided Sept. 6, 1977.
 
 Francis M. Shea, Washington, D. C., with whom Richard T. Conway, David Booth Beers, I. Michael Greenberger, Joseph B. McGrath, Richard Wasserstrom, Washington, D. C., and Stuart A. Heller, Tacoma, Wash., were on the brief for appellant.
 Daniel M. Lewis, Washington, D. C., with whom Peter T. Grossi, Jr., and J. G. Speth, Washington, D. C., were on the brief for appellee Natural Resources Defense Council.
 Larry A. Boggs, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen. and Edmund B. Clark, Atty., Dept. of Justice, Washington, D. C., were on the brief for federal appellees. Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for federal appellees.
 James E. Ryan, Jr., Asst. Atty. Gen., Commonwealth of Virginia, Richmond, Va., filed a brief on behalf of the Commonwealth of Virginia as amicus curiae, urging reversal.
 Theodore O. Torve, Asst. Atty. Gen., State of Washington, Olympia, Wash., filed a brief on behalf of the State of Washington as amicus curiae, urging reversal.
 Before McGOWAN, LEVENTHAL and ROBB, Circuit Judges.
 Opinion for the Court filed by ROBB, Circuit Judge.
 ROBB, Circuit Judge:
 
 
 1
 The Natural Resources Defense Council and the Environmental Defense Fund (referred to collectively as NRDC) brought an action in the District Court seeking (1) a declaratory judgment construing section 208 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1288, and (2) an order directing the Administrator of the Environmental Protection Agency (EPA) to promulgate regulations consistent with the plaintiffs' interpretation of the Act. National Forest Products Association (NFPA), an organization representing firms and local organizations engaged in the forest products industry, was permitted to intervene as a defendant. The District Court granted the plaintiffs' motion for summary judgment and ordered the EPA to promulgate regulations consistent with the court's construction of section 208. Natural Resources Defense Council v. Train, 396 F.Supp. 1386 (D.C.D.C.1975). Both NFPA and EPA filed notices of appeal but thereafter EPA voluntarily dismissed its appeal and has now intervened as an appellee to defend the District Court's decision. The Commonwealth of Virginia and the State of Washington have filed briefs amicus curiae in support of the position taken by NFPA. We affirm.
 
 
 2
 The Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 et seq., establish "a comprehensive program designed 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters . . .' " Natural Resources Defense Council v. Train, 166 U.S.App.D.C. 312, 315, 510 F.2d 692, 695 (1974). A central feature of this attack on the problem of water pollution is section 208, 33 U.S.C. § 1281. The full text of this lengthy section is set out in the appendix to this opinion.
 
 
 3
 Section 208(a) provides that State and local agencies shall develop and implement areawide waste treatment management plans to achieve the Act's 1983 goal of fishable and swimmable waters, section 101(a)(2), 33 U.S.C. § 1251(a) (2). Section 208(a)(1) directs the Administrator of EPA by regulation to publish guidelines for the identification of those areas having substantial water control problems. Section 208(a)(2) provides that "The Governor of each State . . . shall identify each area within the State which, as a result of urban-industrial concentrations or other factors, has substantial water quality control problems." The Governor shall then "designate (A) the boundaries of each such area, and (B) a single representative organization, including elected officials from local governments or their designees, capable of developing effective areawide waste treatment management plans for such area." In the case of an area located in two or more states the Governors of the respective states are to consult and cooperate "toward designating" the boundaries of the interstate area and "toward designating" a "representative organization" to develop effective areawide waste treatment management plans. Sec. 208(a)(3). If no designation is made by a Governor or Governors the "chief elected officials of local governments within an area may by agreement designate" an area and "a single representative organization" capable of developing the waste treatment management plan. Sec. 208(a)(4). Section 208(a)(5) provides: "Existing regional agencies may be designated under paragraphs (2), (3), and (4) of this subsection." Section 208(a)(6), upon which the controversy in this case has focused, provides: "The State shall act as a planning agency for all portions of such State which are not designated under paragraphs (2), (3), or (4) of this subsection."
 
 
 4
 Section 208(b)(1) provides that not later than one year "after the date of designation of any organization" under section 208(a) "such organization shall have in operation a continuing areawide waste treatment management planning process". Section 208(b)(2) in turn specifies the required elements of a proper waste treatment plan. Section 208(b)(2)(A)-(E) applies to the establishment of long-term preventive point source regulatory programs and section 208(b)(2)(F)-(K) relates to programs for identifying and controlling non-point source pollution from agriculture, silviculture, mining, construction and other similar activities. The waste treatment management plans are to be certified annually by the Governors and submitted to the Administrator for his approval. Sec. 208(b)(3). The Administrator is directed to "make grants to any agency designated under subsection (a) of this section (208) for payment of the reasonable costs of developing and operating" the waste treatment planning processes "under subsection (b) of this section." Sec. 208(f)(1). These grants shall be 100% of the costs for each of the three fiscal years beginning June 30, 1973, and not more than 75% of such costs in each succeeding fiscal year. Sec. 208(f)(2).
 
 
 5
 As we have said, section 208(a)(1) of the Act provides that the Administrator of EPA shall by regulation publish guidelines for the identification of those areas having substantial water quality control problems. After some delay EPA promulgated such regulations. 40 C.F.R., Part 126, 38 Fed.Reg. 25,681 (Sept. 14, 1973). At this time EPA took the position that the State when acting as a "planning agency" under section 208(a)(6) was not required to develop a section 208 plan for all areas of the State which had not been "designated". In a subsequent regulation promulgated June 3, 1974, 40 C.F.R., Parts 130 and 131, 39 Fed.Reg. 19,634, EPA suggested that a State could fulfill its section 208 planning requirements for undesignated areas by planning under section 303(e) of the Act. 33 U.S.C. § 1313(e). Planning under section 303(e) includes some, but not all the elements required by section 208 plans.
 
 
 6
 It appears that only about 5% of the nation's waterways were in areas "designated" for local planning. Thus, if the EPA's original interpretation of the statute was correct, 95% of the country's area was not subject to section 208 planning. In particular the long-term preventive programs of section 208(b)(2)(F)-(K), for identifying and controlling non-point source pollution from agriculture, silviculture, mining, construction and other similar activities, were not required or were limited to areas in which they could have little or no effect.
 
 
 7
 Responding to the EPA regulations NRDC notified the Administrator of its intention to file an action for a declaratory judgment that (1) section 208(a) (6) requires the same type of planning in local and State planning areas, and (2) so far as they were inconsistent with that requirement the EPA regulations were invalid. As a result, at a conference with counsel for NRDC on August 29, 1974 EPA's associate general counsel provided counsel for NRDC with an EPA memorandum of law which indicated substantial agreement with NRDC's position. This memorandum, dated August 26, 1974, stated in part:
 
 
 8
 Section 208 appears to require the State to act in the same capacity as the designated organizations and therefore it should apply all of the criteria listed in § 208(b)(2) in the nondesignated areas. However, this does not mean that the same level of planning or implementation of each of those elements is required for every area of the State. The State has flexibility to apply varying degrees of planning, depending on factors such as the amount of development, present water quality, and existing review procedures, which are consistent with the successful implementation of § 208 for any particular area where it is operating as a planning agency.
 
 
 9
 (J.A. 13)
 
 
 10
 This means that plans developed by State agencies in non-designated areas also must implement the requirements of § 208(b)(2)(A)-(K). That is in agreement with the position taken by NRDC in this matter.
 
 
 11
 We do not believe, however, that this conclusion requires States to employ the same sophisticated, comprehensive planning approach throughout the State regardless of the need or the water quality conditions of the area where the planning is to be done.
 
 
 12
 (J.A. 14)
 
 
 13
 Although EPA had signified this agreement with NRDC, regulations implementing the agreement were not forthcoming. Accordingly, NRDC filed its complaint for a declaratory judgment construing section 208(a)(6) and for an order directing EPA to promulgate appropriate regulations. After some skirmishing during which EPA averred that it intended to promulgate such regulations but was not required to do so, NRDC filed its motion for summary judgment. At this stage of the case our appellant National Forest Products Association intervened. NFPA contended, and argues before us, that section 208(a)(6) does not require statewide planning and that any such planning in areas which have not been "designated" for local planning is a matter for State discretion.
 
 
 14
 The District Court granted NRDC's motion for summary judgment. Natural Resources Defense Council v. Train, supra. Emphasizing that section 208 must be read "in the context of the entire Act so that its purpose together with the intent of the whole Act may be effectuated", the court held that section 208 is a "critical provision in a broad, far-reaching Act" which requires comprehensive statewide planning:
 
 
 15
 (Section 208) contains unique authority to control water pollution from point sources (e. g., factory or pipe discharge) . . . and from nonpoint sources (e. g., mining or agricultural runoff). Its implementation features distinguish it from Section 303(e) of the Act, which emphasizes ongoing State planning and limits State efforts to stationary sources of pollution. The Section is also intended to coordinate and integrate other planning, construction, and discharge permit provisions of the Act. Section 208 charts a course not only for the cleaning up of polluted waters but also for the prevention of future pollution by identifying problem sources, regulating construction of certain industrial facilities, and developing processes to control runoff sources of pollution. While Section 208 focuses on "urban-industrial" areas with substantial water quality control difficulties, it also directs attention to other geographical locations with water pollution problems, such as forests, mining areas, farms, and salt water inlets. As a "bottom line" for the Section 208 waste treatment management activities, the Act prescribes a 1983 goal of clean waterways. Id. at 1389. (Citations omitted)
 
 
 16
 The District Court stressed the critical importance of section 208(a)(6) as "the residual clause in the areawide waste treatment management planning provisions". Id. at 1390. The court explained that:
 
 
 17
 (Section 208(a)(6)) deals with the non-designated or "leftover" portions of the State . . . . The plain implication is that (Section 208(a)(6)) empowers the State to achieve what the other (designated) planning organizations . . . are directed to achieve. . . . It would be illogical for Congress to set forth a detailed scheme for State, interstate, and local water pollution planning and then to lump the remainder of State territory into a residuary provision with veiled instructions to the state, to do as it saw fit regarding waste treatment control . . . .
 
 
 18
 There are presently only about 85 designated problem areas in the United States, leaving an estimated 95% of the nation's waterways non-designated . . . . Surely the Congress did not intend Section 208 planning to be the exception rather than the rule . . . . Id. at 1390.
 
 
 19
 The court recognized that the intensity of planning might not be as great in the state planning portions of a State:
 
 
 20
 As (NRDC and Environmental Defense Fund) have stressed on numerous occasions, the subsection (a)(6) regulations will not call for rigorous planning where no pollution problems exist. Rural areas need not implement safeguards for urban pollution problems, and vice versa; planning can be tailored to a region's peculiar problems . . . . A State may certify large portions of its territory as pollution-free and concentrate on preventive measures for these portions as well as on abatement efforts for the substantial problem areas. Id. at 1391-92.
 
 
 21
 The court agreed with NRDC, however, that the States should be advised promptly of their important residual responsibilities:
 
 
 22
 EPA's regulations have positively misled the States in regard to subsection (a)(6) responsibilities. This is not "partial guidance" of the States. It is an impermissible misconstruction of the Act which must be cured swiftly so that the States can understand and fulfill their total planning responsibilities . . . . (P)lanning requirements and directives should precede the actual planning by States lest disorder and inefficiency reduce State efforts to naught. Id. at 1391.
 
 
 23
 The court therefore held (1) that section 208(a)(6) requires that the States implement full section 208 planning in all areas which are not locally designated, (2) that such planning must include the same elements required by section 208(b)(2) for designated areas, (3) that construction grants under Title II and discharge permits under Title IV must be consistent with such State plans, and (4) that under section 208(f) federal funding must be made equally available to State and local planning agencies. Id. at 1392.
 
 
 24
 The court did not attempt to formulate specific regulations implementing its decision but rather directed that EPA do so:
 
 
 25
 It is not for this Court . . . to define or promulgate the subsection (a)(6) regulations. Hopefully, EPA's draft regulations already address the complexities of a State's subsection (a)(6) planning role and delineate the need for State and local cooperation. In any event, a full and prompt rulemaking proceeding will enable interested parties including the States to offer further comments to EPA with reference to the content of the proposed guidelines. Id. at 1392.
 
 
 26
 On July 16 and September 8, 1975, EPA published proposed revised regulations, 40 Fed.Reg. 29,882 and 41,644, and on November 28, 1975 it published final regulations implementing the District Court's order. 40 C.F.R., Parts 130 and 131, 40 Fed.Reg. 55,321 (Nov. 28, 1975).
 
 
 27
 We have referred at length to the District Court's opinion because we agree with its conclusions and substantially agree with its reasoning. We think, as did the District Court, that section 208 sets up a comprehensive scheme for the elimination of water pollution in all areas of a State, both urban-industrial areas and agricultural and forest areas. We think it unreasonable to believe that the Congress intended to exempt from this scheme 95% of the State's areas. We need to consider only briefly the specific arguments to the contrary pressed upon us by NFPA.
 
 
 28
 NFPA argues first that the "plain language of § 208 (demonstrates) that the § 208(b)(2) planning requirements are only required in those areas, and by those organizations, 'designated' under §§ 208(a)(2)-(4)." In support of this argument NFPA engages in a microscopic scrutiny of the words used in section 208. Thus counsel argues (NFPA Br. P. 15):
 
 
 29
 Under the terms of § 208(b)(1), the full § 208(b)(2) planning process only becomes operative within "one year after the date of designation of any organization under " § 208(a). (Emphasis added.) At that time the "continuing areawide waste treatment management planning process" must be developed and be made "applicable to all wastes generated within the areas." § 208(b)(1). (Emphasis added.) Four critical terms in § 208(b)(1), "date of designation," "organization," "areawide," and "area," can only refer to the "areawide" planning "organization(s)" "designated" by Governors and elected officials under §§ 208(a)(2)-(4) for "areas" with "substantial" water problems and thus not to the State.
 
 
 30
 NFPA then turns to section 208(a)(6) which provides that the State "shall act as a planning agency for all portions of such State which are not designated under paragraphs (2), (3), or (4) of this subsection." Because this section does not refer to a State as an "organization" nor is the State "designated" by an elected official or required to plan for "designated areas" NFPA concludes that a State is not within the scope of section 208(b) (1) and therefore need not engage in the section 208(b)(2) planning process for non-designated regions.
 
 
 31
 We are not persuaded by this exercise in semantics. We think the statute must be given a reasonable interpretation, not parsed and dissected with the meticulous technicality applied in testing a common law indictment or deed creating an estate in fee-tail. It is plain to us on the face of section 208 that Congress itself has "designated" the State to act as the entity charged with developing waste treatment management plans under section 208(b)(2) for non-designated regions. We think it is not significant that the State is referred to as an "agency" rather than an "organization". Reasonably interpreted, the word "agency" in section 208(a)(6) is the equivalent of the word "organization" in the preceding paragraphs. This conclusion is fortified by section 208(a)(5) which provides that "regional agencies" may be designated as planning organizations under paragraphs 2, 3 and 4 of the subsection. As for NFPA's objection that the State is not required under section 208(a)(6) to act through a body that includes elected officials, as is the case with organizations designated under sections 208(a)(2), (3) and (4), we need say only that every State government of course includes elected officials. We are not impressed by NFPA's suggestion (Br.P. 16 n. 9) that there is significance in the use of the word "portions" instead of "areas" in section 208(a)(6). NFPA does not explain why this variance has significance and we think it has none.
 
 
 32
 NFPA notes that under section 208(b)(2)(F), (G) and (I) control programs for agriculture, silviculture, mining and salt water non-point pollution are to be pursued only "if appropriate". NFPA says the words "if appropriate" in this context are intended to apply to planning in urban-industrial areas where section 208(b)(2)(F), (G) and (I) planning might be inappropriate. We think a more reasonable interpretation however is that Congress believed that any one area, whether urban-industrial or not, might not be subject to agricultural, silvicultural, salt water and mining pollution.
 
 
 33
 Having scrutinized the words of the statute NFPA turns to its legislative history and argues that this history demonstrates that Congress did not intend to require 208(b) planning for portions of a State not "designated" under sections 208(a)(2)-(4). We have carefully considered this legislative history and NFPA's somewhat involved argument but are not persuaded. Briefly, the theme of the argument is that the House did not intend the States to be responsible for section 208 planning in non-designated areas, and this intention was reflected in the House bill which contained no provision comparable to section 208(a)(6). NFPA argues that section 208(a)(6) as it now stands is a compromise between the Senate version of this section and the House bill's omission of such a section. There is nothing in the legislative history however indicating that section 208(a)(6) is a compromise, intended to weaken the Senate version. Specifically, no such indication appears in the conference report. Although there were changes in the language of the Senate version, the gist of it remained the same.
 
 
 34
 Finally, NFPA argues that as construed by the District Court section 208 violates the Tenth Amendment by compelling the States to expend their own funds and to exercise their own sovereign powers in carrying out a federal regulatory program established by Congress. In response the government says this argument is not properly before us because it was not raised in the District Court and because NFPA has no standing to assert the rights of the States under the Tenth Amendment.
 
 
 35
 We hold that NFPA is entitled to make its constitutional argument in support of its proposed construction of the statute. It is of course familiar doctrine that a statute should if possible be construed so as to avoid constitutional infirmities, and NFPA is entitled to argue that its construction will eliminate the infirmities it perceives in section 208 as construed by EPA and the District Court. Turning to the merits of the argument however we reject it. The District Court's order merely directs EPA to promulgate regulations for the submission of State section 208 plans. As NFPA concedes in its brief (P. 40) the Act contains no provision for enforcement of any obligation that may be imposed upon a State under section 208. In the absence of any provision for sanctions the EPA may of course employ the accepted and traditional means of gaining State compliance by withholding funds under section 208(f), but that method of stimulation would not violate the Tenth Amendment. See District of Columbia v. Train, 172 U.S.App.D.C. 311, 333, 521 F.2d 971, 993 (1975).
 
 The judgment of the District Court is
 
 36
 Affirmed.
 
 APPENDIX
 
 37
 "AREAWIDE WASTE TREATMENT MANAGEMENT
 
 
 38
 "Sec. 208. (a) For the purpose of encouraging and facilitating the development and implementation of areawide waste treatment management plans
 
 
 39
 "(1) The Administrator, within ninety days after the date of enactment of this Act and after consultation with appropriate Federal, State, and local authorities, shall by regulation publish guidelines for the identification of those areas which, as a result of urban-industrial concentrations or other factors, have substantial water quality control problems.
 
 
 40
 "(2) The Governor of each State, within sixty days after publication of the guidelines issued pursuant to paragraph (1) of this subsection, shall identify each area within the State which, as a result of urban-industrial concentrations or other factors, has substantial water quality control problems. Not later than one hundred and twenty days following such identification and after consultation with appropriate elected and other officials of local governments having jurisdiction in such areas, the Governor shall designate (A) the boundaries of each such area, and (B) a single representative organization, including elected officials from local governments or their designees, capable of developing effective areawide waste treatment management plans for such area. The Governor may in the same manner at any later time identify any additional area (or modify an existing area) for which he determines areawide waste treatment management to be appropriate, designate the boundaries of such area, and designate an organization capable of developing effective areawide waste treatment management plans for such area.
 
 
 41
 "(3) With respect to any area which, pursuant to the guidelines published under paragraph (1) of this subsection, is located in two or more States, the Governors of the respective States shall consult and cooperate in carrying out the provisions of paragraph (2), with a view toward designating the boundaries of the interstate area having common water quality control problems and for which areawide waste treatment management plans would be most effective, and toward designating, within one hundred and eighty days after publication of guidelines issued pursuant to paragraph (1) of this subsection, of a single representative organization capable of developing effective areawide waste treatment management plans for such area.
 
 
 42
 "(4) If a Governor does not act, either by designating or determining not to make a designation under paragraph (2) of this subsection, within the time required by such paragraph, or if, in the case of an interstate area, the Governors of the States involved do not designate a planning organization within the time required by paragraph (3) of this subsection, the chief elected officials of local governments within an area may by agreement designate (A) the boundaries for such an area, and (B) a single representative organization including elected officials from such local governments, or their designees, capable of developing an areawide waste treatment management plan for such area.
 
 
 43
 "(5) Existing regional agencies may be designated under paragraphs (2), (3), and (4) of this subsection."(6) The State shall act as a planning agency for all portions of such State which are not designated under paragraphs (2), (3), or (4) of this subsection.
 
 
 44
 "(7) Designations under this subsection shall be subject to the approval of the Administrator.
 
 
 45
 "(b)(1) Not later than one year after the date of designation of any organization under subsection (a) of this section such organization shall have in operation a continuing areawide waste treatment management planning process consistent with section 201 of this Act. Plans prepared in accordance with this process shall contain alternatives for waste treatment management, and be applicable to all wastes generated within the area involved. The initial plan prepared in accordance with such process shall be certified by the Governor and submitted to the Administrator not later than two years after the planning process is in operation.
 
 
 46
 "(2) Any plan prepared under such process shall include, but not be limited to
 
 
 47
 "(A) the identification of treatment works necessary to meet the anticipated municipal and industrial waste treatment needs of the area over a twenty-year period, annually updated (including an analysis of alternative waste treatment systems), including any requirements for the acquisition of land for treatment purposes; the necessary waste water collection and urban storm water runoff systems; and a program to provide the necessary financial arrangements for the development of such treatment works;
 
 
 48
 "(B) the establishment of construction priorities for such treatment works and time schedules for the initiation and completion of all treatment works;
 
 
 49
 "(C) the establishment of a regulatory program to
 
 
 50
 "(i) implement the waste treatment management requirements of section 201(c),
 
 
 51
 "(ii) regulate the location, modification, and construction of any facilities within such area which may result in any discharge in such area, and
 
 
 52
 "(iii) assure that any industrial or commercial wastes discharged into any treatment works in such area meet applicable pretreatment requirements;
 
 
 53
 "(D) the identification of those agencies necessary to construct, operate, and maintain all facilities required by the plan and otherwise to carry out the plan;
 
 
 54
 "(E) the identification of the measures necessary to carry out the plan (including financing), the period of time necessary to carry out the plan, the costs of carrying out the plan within such time, and the economic, social, and environmental impact of carrying out the plan within such time;
 
 
 55
 "(F) a process to (i) identify, if appropriate, agriculturally and silviculturally related nonpoint sources of pollution, including runoff from manure disposal areas, and from land used for livestock and crop production, and (ii) set forth procedures and methods (including land use requirements) to control to the extent feasible such sources;
 
 
 56
 "(G) a process to (i) identify, if appropriate, mine-related sources of pollution including new, current, and abandoned surface and underground mine runoff, and (ii) set forth procedures and methods (including land use requirements) to control to the extent feasible such sources;
 
 
 57
 "(H) a process to (i) identify construction activity related sources of pollution, and (ii) set forth procedures and methods (including land use requirements) to control to the extent feasible such sources;
 
 
 58
 "(I) a process to (i) identify, if appropriate, salt water intrusion into rivers, lakes, and estuaries resulting from reduction of fresh water flow from any cause, including irrigation, obstruction, ground water extraction, and diversion, and (ii) set forth procedures and methods to control such intrusion to the extent feasible where such procedures and methods are otherwise a part of the waste treatment management plan;
 
 
 59
 "(J) a process to control the disposition of all residual waste generated in such area which could affect water quality; and
 
 
 60
 "(K) a process to control the disposal of pollutants on land or in subsurface excavations within such area to protect ground and surface water quality.
 
 
 61
 "(3) Areawide waste treatment management plans shall be certified annually by the Governor or his designee (or Governors or their designees, where more than one State is involved) as being consistent with applicable basin plans and such areawide waste treatment management plans shall be submitted to the Administrator for his approval.
 
 
 62
 "(4) Whenever the Governor of any State determines (and notifies the Administrator) that consistency with a statewide regulatory program under section 303 so requires, the requirements of clauses (F) through (K) of paragraph (2) of this subsection shall be developed and submitted by the Governor to the Administrator for application to all regions within such State.
 
 
 63
 "(c)(1) The Governor of each State, in consultation with the planning agency designated under subsection (a) of this section, at the time a plan is submitted to the Administrator, shall designate one or more waste treatment management agencies (which may be an existing or newly created local, regional, or State agency or political subdivision) for each area designated under subsection (a) of this section and submit such designations to the Administrator.
 
 
 64
 "(2) The Administrator shall accept any such designation, unless, within 120 days of such designation, he finds that the designated management agency (or agencies) does not have adequate authority
 
 
 65
 "(A) to carry out appropriate portions of an areawide waste treatment management plan developed under subsection (b) of this section;
 
 
 66
 "(B) to manage effectively waste treatment works and related facilities serving such area in conformance with any plan required by subsection (b) of this section;
 
 
 67
 "(C) directly or by contract, to design and construct new works, and to operate and maintain new and existing works as required by any plan developed pursuant to subsection (b) of this section;
 
 
 68
 "(D) to accept and utilize grants, or other funds from any source, for waste treatment management purposes;
 
 
 69
 "(E) to raise revenues, including the assessment of waste treatment charges;
 
 
 70
 "(F) to incur short- and long-term indebtedness;
 
 
 71
 "(G) to assure in implementation of an areawide waste treatment management plan that each participating community pays its proportionate share of treatment costs;
 
 
 72
 "(H) to refuse to receive any wastes from any municipality or subdivision thereof, which does not comply with any provisions of an approved plan under this section applicable to such area; and
 
 
 73
 "(I) to accept for treatment industrial wastes.
 
 
 74
 "(d) After a waste treatment management agency having the authority required by subsection (c) has been designated under such subsection for an area and a plan for such area has been approved under subsection (b) of this section, the Administrator shall not make any grant for construction of a publicly owned treatment works under section 201(g)(1) within such area except to such designated agency and for works in conformity with such plan.
 
 
 75
 "(e) No permit under section 402 of this Act shall be issued for any point source which is in conflict with a plan approved pursuant to subsection (b) of this section.
 
 
 76
 "(f)(1) The Administrator shall make grants to any agency designated under subsection (a) of this section for payment of the reasonable costs of developing and operating a continuing areawide waste treatment management planning process under subsection (b) of this section.
 
 
 77
 "(2) The amount granted to any agency under paragraph (1) of this subsection shall be 100 per centum of the costs of developing and operating a continuing areawide waste treatment management planning process under subsection (b) of this section for each of the fiscal years ending on June 30, 1973, June 30, 1974, and June 30, 1975, and shall not exceed 75 per centum of such costs in each succeeding fiscal year.
 
 
 78
 "(3) Each applicant for a grant under this subsection shall submit to the Administrator for his approval each proposal for which a grant is applied for under this subsection. The Administrator shall act upon such proposal as soon as practicable after it has been submitted, and his approval of that proposal shall be deemed a contractual obligation of the United States for the payment of its contribution to such proposal. There is authorized to be appropriated to carry out this subsection not to exceed $50,000,000 for the fiscal year ending June 30, 1973, not to exceed $100,000,000 for the fiscal year ending June 30, 1974, and not to exceed $150,000,000 for the fiscal year ending June 30, 1975.
 
 
 79
 "(g) The Administrator is authorized, upon request of the Governor or the designated planning agency, and without reimbursement, to consult with, and provide technical assistance to, any agency designated under subsection (a) of this section in the development of areawide waste treatment management plans under subsection (b) of this section.
 
 
 80
 "(h)(1) The Secretary of the Army, acting through the Chief of Engineers, in cooperation with the Administrator is authorized and directed, upon request of the Governor or the designated planning organization, to consult with, and provide technical assistance to, any agency designed under subsection (a) of this section in developing and operating a continuing areawide waste treatment management planning process under subsection (b) of this section.
 
 
 81
 "(2) There is authorized to be appropriated to the Secretary of the Army, to carry out this subsection, not to exceed $50,000,000 per fiscal year for the fiscal years ending June 30, 1973, and June 30, 1974."
 
 
 
 *
 For convenience the court will refer to this case hereafter as "NRDC v. EPA (Nat'l Forest Products Ass'n Section 208 Planning)."